| | |
|---|---|
| GREGORY R. BANTIN and JULIE L. BANTIN, )<br>)<br>Plaintiffs, )<br>)<br>vs. )<br>)<br>AIR & LIQUID SYSTEMS CORPORATION, et al., )<br>)<br>Defendants. )<br>_____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court on the Plaintiffs' "Motion for Summary Judgment Regarding Defendant Atwood & Morrill's Affirmative Defenses" [Doc. 101] and Defendant Weir Valves & Controls USA, Inc.'s, individually and as successor to Atwood & Morrill Co., ("Atwood & Morrill") Motion for Summary Judgment [Doc. 102].

**I.    PROCEDURAL BACKGROUND**

On November 24, 2020, the Plaintiffs Gregory R. Bantin and Julie L. Bantin filed this action against a total of fifteen defendants alleging that Mr. Bantin contracted mesothelioma from breathing asbestos dust during the course of his service in the United States Navy from approximately 1965 to 1974. [Doc. 1 at ¶¶ 35-40]. In their Complaint, the Plaintiffs assert six causes

of action: (1) defective design; (2) failure to warn; (3) breach of implied warranty; (4) gross negligence and willful, wanton, and reckless conduct; (5) conspiracy, against Defendant Metropolitan Life Insurance Co.; and (6) loss of consortium. [Id. at ¶¶ 41-87].

Over the course of the litigation, the Plaintiffs voluntarily dismissed their claims against several of the named Defendants. [See Docs. 75 (Aurora Pump Co.); 77 (Metropolitan Life Insurance Co.); 79 (Hopeman Brothers, Inc.); 80 (Metalclad Insulation, LLC); 93 (FMC Corp.); 95 (McNally Industries, Inc.); 98 (Armstrong International, Inc.); 99 (Velan Calve Corp.); 111 (The William Powel Co.); 113 (Air & Liquid Systems Corp.); 115 (Crane Co.)]. On December 3, 2021, the Plaintiffs filed a "Motion for Summary Judgment Regarding Defendant Atwood & Morrill's Affirmative Defenses." [Doc. 101]. In turn, Defendant Atwood & Morrill filed a Motion for Summary Judgment regarding all of the Plaintiffs' claims. [Doc. 102].

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

2

248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" on the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence

3

from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Where, as here, the parties have filed cross-motions for summary judgment, the Court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

### III. FACTUAL BACKGROUND[1]

The Plaintiff Gregory R. Bantin was diagnosed with mesothelioma on August 28, 2020. [Preserved Trial Deposition of Gregory R. Bantin ("Bantin Trial Dep."), Doc. 107-1 at 10:23; Doc. 107-20 at 15].

Mr. Bantin enlisted in the U.S. Navy in 1965. [Bantin Trial Dep., Doc. 107-1 at 13:7-23]. After enlisting, Mr. Bantin completed eight weeks of basic

---

[1] "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L.Ed.2d 686 (2007). This summary of facts is presented for the analysis of Defendant Atwood & Morrill's Motion for Summary Judgment. Thus, the facts are viewed in the light most favorable to the Plaintiffs.

training followed by an additional four months of instruction in machinist school. [Id. at 13:24-17:9]. There, Mr. Bantin trained to become a machinist mate and operate various pieces of equipment on U.S. Navy ships. [Id. at 15:23-17:9].

In February of 1966, Mr. Bantin was assigned to the U.S.S. Eaton, where he remained for approximately twenty-six months. [see id. at 45:4-6; see also Discovery Deposition of Gregory R. Bantin ("Bantin Disc. Dep."), Doc. 107-2 at 77:19-24]. The U.S.S. Eaton is a Fletcher-class destroyer built in 1942 at Bath Iron Works, a shipyard in Maine that works exclusively on U.S. Navy Ships. [Bantin Trial Dep., Doc. 107-1 at 16:6-8; see also Moore Report, Doc. 107-3 at 7, 19]. The U.S.S. Eaton is approximately 300 to 350 feet long and has two boiler rooms and two engine rooms. [Bantin Trial Dep., Doc. 107-1 at 18:15-16]. During Mr. Bantin's service on the U.S.S. Eaton, the ship sailed for approximately one or two weeks at a time before returning to port. [Id. at 33:17-34:8].

While he was assigned to the U.S.S. Eaton, Mr. Bantin served as a fireman, and he was responsible for cleaning, sweeping, and reading gauges. [Id. at 18:19-24]. Mr. Bantin also "live[d]" in the bilges, an area in the bottom of the ship that would fill with water, and he would clean and scrape the area under the ship's condenser. [Id. at 19:1-20:22].

5

Mr. Bantin primarily served as a machinist assigned to the U.S.S. Eaton's after engine room. [Id. at 20:23-21:1]. Mr. Bantin did some work in the main engine room, but that work was limited to "reading dials and stuff." [Id. at 21:10-20]. The after engine room is located in the last third of the ship, behind the main engine room, and sits below the water line. [Id. at 21:2-23]. The after engine room is approximately 50 feet long, with a four-foot-wide pathway. [Id. at 22:5-15]. The after engine room did not have air conditioning. [Id. at 22:25-23:1]. Instead, the after engine room had force draft blowers that would blow dust around the room. [Id. at 22:25-25:5]. Mr. Bantin and the other sailors assigned to the after engine room were "like a little family," [id. at 25:22-26:18], and Mr. Bantin would spend approximately 12 to 16 hours a day in the after engine room, [id. at 45:11-15]. When the U.S.S. Eaton was in port, Mr. Bantin and other crew members would sometimes sleep in the after engine room. [Id. at 26:3-14].

In the after engine room, part of Mr. Bantin's assignment included maintaining pumps and valves. [Id. at 28:4-41:22]. Mr. Bantin placed lubrication on valve stems to ensure that they opened and closed properly. [Id. at 25:10-32:10]. Mr. Bantin and other crew members "didn't have to really take any [valves] apart," but Mr. Bantin does recall replacing the

6

gaskets and working on flanges near the throttle board of a main steam line. [Id. at 32:4-33:14].

While the U.S.S. Eaton was at sea, Mr. Bantin ensured that packing in pumps was not leaking. [Id. at 28:4-11]. At times, Mr. Bantin had to replace packing in pumps in the after engine room while the ship was running. [Id. at 28:12-29:12]. Mr. Bantin also replaced gaskets in cold lines and essential equipment while the ship was running. [Id. at 30:6-20]. However, Mr. Bantin did not perform maintenance work on packing associated with valves while the U.S.S. Eaton was at sea. [Id. at 33:12-16].

While the U.S.S. Eaton was in port, Mr. Bantin does not recall breaking apart pumps, breaking apart valves, or working on the interior components of valves. [Bantin Disc. Dep., Doc. 107-2 at 56:8-16, 57:4-10]. Mr. Bantin does recall removing packing in pumps as part of a preventative maintenance schedule while the ship was in port. [Id. at 57:21-58:20]. Additionally, when gaskets in the after engine room equipment needed to be replaced, they were primarily replaced while the U.S.S. Eaton was in port because the equipment was too hot to replace gaskets while the ship was running. [Bantin Trial Dep., Doc. 107-1 at 30:10-15].

To replace gaskets on pumps and valves, Mr. Bantin needed to "break" the flange, remove the old gasket, and clean the flange with a wire brush.

7

[Id. at 36:5-40:6, 41:14-22]. On steam lines, Mr. Bantin and other crew members used flexitallic metallic gaskets that were pre-cut to the proper size. [Id. at 40:7-41:13]. When performing his maintenance work, Mr. Bantin was given a new gasket and told it was for a specific piece of equipment. [Id. at 41:3-13].

While Mr. Bantin completed maintenance tasks in the after engine room, other firemen and machinists also performed the same types of tasks as Mr. Bantin. [Id. at 44:10-45:3]. Crew members in the after engine room performed maintenance tasks without gloves, respirators, or other forms of protection. [Id. at 29:14-20]. Mr. Bantin does not recall who manufactured the valves that he worked on or around while assigned to the U.S.S. Eaton's after engine room. [Id. at 42:25-44:9].

In opposition to Defendant Atwood and Morrill's Motion for Summary Judgment, the Plaintiffs have presented the expert opinion of Captain Arnold Moore. Captain Moore graduated from the U.S. Naval Academy in 1968, and he focused on shipboard engineering, repair, and overhaul of U.S. Navy ships during his career. [Moore Report, Doc. 107-3 at 4]. Later, Captain Moore obtained a master's degree in naval architecture and a professional degree in ocean engineering from the Massachusetts Institute of Technology. [Id.]. Captain Moore has twenty-six years of experience as a

8

naval officer and engineer. [Id. at 6]. Captain Moore examined ship records of the ships Mr. Bantin served aboard while in the U.S. Navy as well as other documents recording the types of equipment used on those ships. [Id. at 31-33]. Captain Moore concluded that valves manufactured by Defendant Atwood and Morrill were used in the engine rooms on the U.S.S. Eaton. [See id. at 10, 15-16, 19]. In his report, Captain Moore states that:

> Gibbs and Cox letters dated 5 November 1941 and 15 December 1942 record Atwood and Morrill manufactured steam pressure regulating and unloading valves used with the main propulsion turbines, main condensers and auxiliary condensers installed in the engine rooms on EATON. Atwood and Morrill drawing 2312-F depicts 2 inch diameter balanced valves installed in condensate vent and drain and feed pump recirculating systems in the engine rooms on EATON. These valves utilized plastic non-metallic packing (MIL-P-17303) to seal valves stems. Military Specification MIL-P-17303 records all the types of plastic non-metallic packing defined by this specification (Navy symbols 1106, 1108, 1109 and 1111) contain asbestos.
>
> ***
>
> The following paragraphs present sales records for asbestos repair components to the Navy by companies that manufactured machinery installed on EATON. This equipment was identified earlier in this report.
>
> An Atwood and Morrill order acknowledgment with an order date of 20 May 1968 records Atwood and Morrill sold four asbestos gaskets (6 ¾ inch OD x 6

9

> inch ID, 1/16 inch thick) to Bath Iron Works. Bath Iron
> Works builds and overhauls Navy ships only.

[Id. at 15-16, 19].

Further, Captain Moore states that packing and gaskets were selected for U.S. Navy ships "based on the fluids being handled and the temperature and pressure ranges in which this machinery would operate," and "[o]nce a manufacturer chose a specific type of asbestos-containing packing or gasket, that packing or gasket was normally utilized for the life of the machinery." [Id. at 10]. Specifically, Captain Moore states that:

> Finding an acceptable non-asbestos substitute was very difficult and not normally attempted before the Navy and industry began to try to develop substitutes for asbestos packing and gaskets in the late 1970s and early 1980s. The following documents prepared by Navy machinery and packing suppliers illustrate this point:
>
> ***
>
> e. An Atwood and Morrill Technical Bulletin dated August 2010 states "[v]alves designed for asbestos packing rings required six or more rings to get effective sealing. Modern packing systems do not have the same compressibility that asbestos did and do not work as intended in these older valves."

[Id.].

The Plaintiffs have also presented the prior deposition testimony of Samuel Shields, a corporate representative of Defendant Atwood and Morrill.

[Shields 2004 Dep., Doc. 107-4; Shields 2007 Dep., Doc. 107-5; Shields 2009 Dep., Doc. 107-6]. In those prior cases, Mr. Shields testified that some of the valves manufactured by Defendant Atwood and Morrill contained asbestos gaskets and packing beginning in the 1930s. [Shields 2004 Dep., Doc. 107-4 at 41:19-42:11, 61:3-17; Shields 2007 Dep., Doc. 107-5 at 24:22-25, 59:6-13]. Defendant Atwood and Morrill continued to manufacture valves containing asbestos gaskets and packing until 1985. [Shields 2007 Dep., Doc. 107-5 at 24:22-25]. Additionally, some valves manufactured by Defendant Atwood and Morrill contained an asbestos insulation board. [Shields 2009 Dep., Doc. 107-6 at 38:19-39:7]. Defendant Atwood and Morrill also sold replacement gaskets and packing for use in its valves, published product manuals instructing that asbestos replacement parts be used, and sometimes supplied asbestos replacement parts at the time of an initial sale when requested by the customer. [Shields 2004 Dep., Doc. 107-4 at 58:10-59:8, 220:5-221:1; Shields 2007 Dep., Doc. 107-5 at 25:6-12, 26:2-8].

Mr. Bantin completed his service on the U.S.S. Eaton in April of 1968. [Bantin Disc. Dep., Doc. 107-2 at 76:17-78:1]. From late 1968 until August of 1969, Mr. Bantin served on the U.S.S. Arlington. [Id. at 77:5-18; Bantin Trial Dep., Doc. 107-1 at 53:18-21]. There, Mr. Bantin was assigned to the

11

ship's air conditioning plant, and he would remove, clean, and replace air filters in ten or fifteen places around the ship. [Bantin Trial Dep., Doc. 107-1 at 54:8-61:12]. In September of 1969, Mr. Bantin was assigned to the U.S.S. Inchon. [Id. at 61:15-22]. However, because the Inchon was under construction at that time, Mr. Bantin did not spend any time aboard the U.S.S. Inchon during his assignment. [Id. at 61:23-63:11]. Mr. Bantin did not perform any work on valves while assigned to the U.S.S. Arlington or the U.S.S. Inchon. [Bantin Disc. Dep., Doc. 107-2 at 69:18-70:1]. Following his assignment to the U.S.S. Inchon, Mr. Bantin served as an instructor at a correctional facility located in Great Lakes, Illinois until he was honorably discharged from the U.S. Navy in May of 1974. [Bantin Trial Dep., Doc. 107-1 at 64:8-66:17].

## IV. DISCUSSION

### A. Atwood & Morrill's Motion for Summary Judgment

Defendant Atwood & Morrill argues that it is entitled to summary judgment on all of the Plaintiffs' claims because "there is no evidence that the Plaintiff, Gregory R. Bantin, worked with or around a product for which Atwood & Morrill is responsible." [Doc. 102 at 1]. Defendant Atwood & Morrill further argues that "[t]o the extent such a product is identified, there is no evidence that Mr. Bantin worked with or around such a product with the

12

Case 1:20-cv-00341-MR-WCM   Document 116   Filed 06/28/22   Page 12 of 18

requisite frequency and proximity, as required by controlling law, such that it could be considered a substantial contributing factor in causing his disease." [Id. at 1-2].

The parties agree that maritime law applies to the Plaintiffs' claims against Defendant Atwood & Morrill. [Doc. 103 at 4; Doc. 107 at 15]. The Supreme Court has held "that maritime law applies when 1) a tort occurs on navigable waters, (the 'location test') and 2) the incident could have a 'potentially disruptive impact on maritime commerce' and the 'activity giving rise to the incident has a substantial relationship to traditional maritime activity' (the 'connection test')." Yates v. Air & Liquid Sys. Corp., No. 5:12-cv-752-FL, 2014 WL 348301 (E.D.N.C. Jan. 31, 2014) (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534, 115 S. Ct. 1043, 130 L.Ed.2d 1024 (1995)). Maritime law also applies "to torts occurring on a ship docked at a marina located on a navigable waterway." Id. (citing Sisson v. Ruby, 497 U.S. 358, 363, 110 S. Ct. 2892, 111 L.Ed.2d 292 (1990)). Further, asbestos exposure "which occurs aboard a ship on navigable waters satisfies the connection test, because it poses a danger of injury to other crew members which could affect maritime commerce." Id. Accordingly, maritime law applies to tort claims arising from asbestos exposure aboard ships on navigable waters or docked at shipyards located

13

on a navigable waterway. See id.; see also Deuber v. Asbestos Corp., No. 2:10-cv-78931-ER, 2011 WL 6415339, at *1 n1 (E.D. Pa. Dec. 2, 2011); Lambert v. Babcock & Wilcox, Co., 70 F. Supp. 2d 877, 884 (S.D. Ind. 1999); John Crane, Inc. v. Jones, 274 Va. 581, 588, 650 S.E.2d 851, 854 (2007). Therefore, maritime law applies to the Plaintiffs' claims arising from Mr. Bantin's service aboard U.S. Navy ships.

The Fourth Circuit has not formulated a standard for establishing causation in cases involving asbestos exposure specifically in the maritime context. However, the Sixth Circuit has instructed that, under maritime law, a plaintiff must show "for each defendant, that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." Lindstrom v. A-C Product Liability Trust, 424 F.3d 488, 492 (6th Cir. 2005), *abrogated on other grounds by* Air & Liquid Sys. Corp. v. DeVries, -- U.S. --, 139 S. Ct. 986, 203 L.Ed.2d 373 (2019). In contrast, "a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient." Id. "Rather, where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." Id. (internal quotation marks and citation omitted).

The standard articulated by the Sixth Circuit for establishing causation under maritime law is also consistent with the "frequency, regularity, and proximity" test espoused by the Fourth Circuit in Lohrmann. See Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156, 1163 (4th Cir. 1986). There, the Fourth Circuit held that, to support a reasonable inference of substantial causation based on circumstantial evidence, a plaintiff must present "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." Id. at 1162-63. Accordingly, a plaintiff "must prove more than a casual or minimum contact with the product containing asbestos in order to hold [the defendant] liable." Jones v. Owens-Corning Fiberglas Corp., 69 F.3d 712, 716 (4th Cir. 1995) (internal quotation marks omitted). "The failure to specifically identify a defendant's presence warrants a grant of summary judgment." Anger v. Daniel Int't Corp., No. 3:98-cv-220, 2007 WL 57769, at *4-5 (W.D.N.C. Jan. 5, 2007) (applying both Lindstrom and Lohrmann to grant summary judgment for the defendant where the plaintiff, who alleged that he was exposed to asbestos while employed at a fibers plant, "failed to present evidence of exposure to asbestos as a result of conduct by" the defendant).

Here, the forecast of evidence taken in the light most favorable to the Plaintiffs is insufficient for a reasonable juror to conclude that Mr. Bantin was exposed to an asbestos-containing product manufactured by Defendant Atwood and Morrill. Indeed, Mr. Bantin admitted that he did not perform any maintenance work on valves while assigned to the U.S.S. Arlington or the U.S.S. Inchon, [Bantin Disc. Dep., Doc. 107-2 at 69:18-70:1], and Mr. Bantin cannot recall who manufactured the valves he worked on or around while assigned to the U.S.S. Eaton, [Bantin Trial Dep., Doc. 107-1 at 42:25-44:9].

The only evidence the Plaintiffs have presented that valves manufactured by Defendant Atwood and Morrill were used on the U.S.S. Eaton is the expert report prepared by Captain Moore. There, Captain Moore found letters dated November 5, 1941 and December 5, 1942 stating that asbestos-containing valves manufactured by Defendant Atwood and Morrill were installed in the engine rooms on the U.S.S. Eaton. [Moore Report, Doc. 107-3 at 15-16]. Captain Moore also found an order acknowledgment form dated May 20, 1968 stating that Defendant Atwood and Morrill sold four asbestos gaskets to Bath Iron Works, a shipyard that works only on U.S. Navy ships. [Id. at 19]. Captain Moore further explained that finding suitable non-asbestos replacement parts "was very difficult," and, therefore, "[o]nce a manufacturer chose a specific type of asbestos-containing packing or

16

gasket, that packing or gasket was *normally* utilized for the life of the machinery." [Id. at 10] (emphasis added).

Captain Moore's report is insufficient to show that valves manufactured by Defendant Atwood and Morrill were used in the U.S.S. Eaton's after engine room *at the same time* that Mr. Bantin was present. Mr. Bantin was assigned to the U.S.S. Eaton from February of 1966 to April of 1968. [Bantin Trial Dep., Doc. 107-1 at 45:4-6; Bantin Disc. Dep., Doc. 107-2 at 76:17-78:1]. Thus, Mr. Bantin began his service aboard the U.S.S. Eaton over twenty years after the November 5, 1941 and December 5, 1942 letters referenced in the Moore Report, and Mr. Bantin completed his assignment one month prior to the May 20, 1968 sales record. The conclusion that Mr. Bantin was exposed to asbestos-containing valves manufactured by Defendant Atwood and Morrill because such valves were present on the U.S.S. Eaton twenty years prior to Mr. Bantin's assignment and valve replacement parts were sold to a shipyard that worked on U.S. Navy ships three months after Mr. Bantin's assignment is, at best, speculative.[2]

Therefore, because the forecast of evidence fails to establish a nexus between Mr. Bantin and an asbestos-containing product manufactured by

---

[2] Notably, there is also no evidence in the record to indicate that the four asbestos-containing gaskets sold to Bath Iron Works on May 20, 1968 were used aboard the U.S.S. Eaton, rather than a different U.S. Navy ship.

17

Case 1:20-cv-00341-MR-WCM   Document 116   Filed 06/28/22   Page 17 of 18

Defendant Atwood and Morrill, Defendant Atwood and Morrill's Motion for Summary Judgment is granted.

### B. Plaintiffs' Motion for Summary Judgment

The Plaintiffs moved for summary judgment regarding various affirmative defenses asserted by Defendant Atwood & Morrill. [Doc. 101 at 1]. The Court having determined that Defendant Atwood & Morrill's Motion for Summary Judgment should be granted, the Plaintiffs' motion is denied as moot.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant Weir Valves & Controls USA, Inc's, individually and as successor to Atwood & Morrill Co., Motion for Summary Judgment [Doc. 102] is **GRANTED,** and the Plaintiffs' claims against Defendant Weir Valves & Controls USA, Inc. are hereby **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that the "Plaintiffs' Motion for Summary Judgment Regarding Defendant Atwood & Morrill's Affirmative Defenses" [Doc. 101] is **DENIED** as moot.

**IT IS SO ORDERED.**

Signed: June 27, 2022

Martin Reidinger
Chief United States District Judge